**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
OCTOBER 13, 2022

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 13, 2022

ERIN L. LENNON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Welfare of: | ) | No. 100144-4 |
| M.R. | ) | En Banc |
|  | ) | Filed : October 13, 2022 |

WHITENER, J.—This case presents an issue of first impression arising from the business records exception to the rule against hearsay, that is, the admissibility of a drug rehabilitation and testing center incident report under RCW 5.45.020.

The child in this case, M.R., was removed from her parents' custody shortly after birth because of her mother's history of involvement with Child Protective Services for her two older children and the mother's suspected ongoing substance abuse and mental health problems. In 2017, the Department of Children, Youth, and Families (Department) filed a petition to terminate the parental rights of M.R.'s father, D.R. Throughout the course of M.R.'s dependency, the juvenile court ordered D.R. to engage in various remedial services designed to correct his perceived parenting deficiencies. These services focused on D.R.'s protective parenting skills and his ability to provide a safe and stable living environment. Due to renewed

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In the Matter of the Welfare of M.R.*, No. 100144-4

concerns about D.R.'s ability to safely parent M.R. and his suspected recent drug use, the Department asked D.R. to provide a urinalysis (UA) sample. D.R. went to the Kitsap Recovery Center (KRC) for the UA test but left without providing a sample. The KRC staff member who monitored the test submitted an incident report, which stated D.R. had been seen attempting to open a UA "device" during the test.

The State moved to terminate D.R.'s parental rights, and at the time of the trial, despite several follow-up requests to comply with a UA test, D.R. failed to produce a UA sample. At trial, in addition to testimony from department social workers and the guardian ad litem (GAL) assigned to the case, the incident report was admitted as a business record to show D.R. was caught attempting to use a UA device.

In November 2020, D.R.'s parental rights were terminated. He appealed, arguing the judge committed prejudicial error by admitting the incident report as a business record because the observation of the UA device involved a degree of "skill of observation" akin to expert testimony and in excess of the scope of the business records exception. The Court of Appeals affirmed.

The incident report in this case relied on personal observations as opposed to the kind of purely clerical or bookkeeping records or scientific test results our courts traditionally have deemed admissible under RCW 5.45.020. However, the judge's decision to admit the incident report met applicable legal standards and was not

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

manifestly unreasonable or based on untenable grounds. We hold there was no abuse of discretion and, therefore, affirm.

FACTS AND PROCEDURAL HISTORY

A.    Dependency of M.R.

M.R. was born in July 2016. The Department removed her from her parents' custody shortly after birth because of the mother's history of substance abuse (and suspected continued drug use), neglect of her two older children, and mental health problems. Since birth M.R. has been living in a licensed foster care home with her two maternal half-siblings, and that placement has been identified as a prospective adoptive home. M.R.'s mother has relinquished her parental rights to M.R., but D.R. has not. The Department filed a petition to terminate D.R.'s parental rights in November 2017.

In September 2016, M.R. was found to be a "dependent child" under RCW 13.34.030(6) because she had no parent or guardian capable of caring for her. After a disposition hearing in October 2016, the juvenile court judge continued M.R.'s dependency after finding D.R. could not adequately protect M.R.'s "health, safety, and welfare" in the home. Ex. 16, at 257. The Department suspected D.R. was living with M.R.'s mother at that time, and the Department was concerned D.R. would not be able to protect M.R. from the safety risks posed by contact with the mother. The judge ordered D.R. to complete various services designed to correct his perceived

3

*In the Matter of the Welfare of M.R.*, No. 100144-4

parenting deficiencies, including a parenting skills class, drug and alcohol assessment, and compliance with random UA testing.[1] D.R. was granted two-hour supervised visits with M.R. twice per week.

D.R. completed all court-ordered services. His drug and alcohol assessment revealed that as of December 2016, he showed no signs of a substance use disorder and no treatment was needed. In September 2017, D.R.'s mental health counselor (who had been referred by the Department) wrote a letter stating that although D.R. had begun participating in protective parenting services, D.R. was "suspicious" of the counselor, not forthcoming when discussing his relationship with M.R.'s mother (whom he was living with), and had stopped participating in services before the program was completed. Ex. 31, at 413; *see* 1 Verbatim Report of Proceedings (VRP) (Sept. 28, 2020) at 175-78. The mental health counselor later testified he did not believe D.R. "made any progress" in the protective parenting program. 1 VRP (Sept. 28, 2020) at 178. In May 2018, after a dependency review hearing, the judge found D.R. continued to exhibit parenting deficiencies and ordered additional

---

[1] The full list of required services is as follows: (1) cooperate with the Department's reasonable requests for financial information, (2) consent to a release of information so service providers could exchange information with the department social worker and guardian ad litem; (3) provide written documentation of D.R.'s attendance, participation, completion, and progress with respect to court-ordered services, (4) update the social worker and GAL of D.R.'s address and contact information, (5) contact the social worker and GAL at least twice monthly to update them on his case plan, report progress, and appointments, (6) provide samples for random UA testing upon request by the social worker or GAL, (7) participate in drug and alcohol assessment and comply with recommendations from the assessment, and (8) complete a parenting education program. Ex. 16, at 259.

*In the Matter of the Welfare of M.R.*, No. 100144-4

services to develop his protective parenting skills.[2] D.R. completed the additional court-ordered services but was required to continue to provide UA samples at the request of a department social worker or GAL.

> B.     Incidents that prompted the Department to pursue termination of D.R.'s parental rights

D.R. visited M.R. regularly throughout the dependency and demonstrated generally caring and engaged parenting behavior in their time together. *Id*. at 207-08. Their supervised visits took place in public spaces, and most occurred without incident until December 2019, when the Department became concerned by D.R.'s behavior.

In April and May 2019, D.R. missed visits because he was in jail for 20 days for eluding a police vehicle. In December 2019, D.R. was observed twice riding a bicycle while holding M.R. in his arms; at the time, M.R. was three years old and was not wearing a helmet.[3] In December 2019, the visit monitor intervened during a visit at a Chuck E. Cheese restaurant when D.R. failed to watch M.R. closely and

---

[2] The full list of additional court-ordered services is as follows: (1) engage in individual counseling to develop protective parenting skills, (2) provide UA samples at the request of the department social worker or GAL, (3) engage in a fatherhood group, (4) consent to the release of information between his counselors and the department social worker and GAL, (5) maintain weekly contact with the department social worker and GAL, (6) inform the department social worker and GAL of any difficulties he might have in accessing the services and any questions or concerns about M.R.'s placement, (7) maintain a safe and stable living environment, (8) update the department social worker and GAL with his address and phone numbers, and (9) possibly consent to a background check. Ex. 20, at 321-22.

[3] D.R. testified that he was only coasting a short distance on a sidewalk with M.R. in his lap. He did not perceive this to be dangerous, and he denied anyone from the Department told him it was dangerous.

she wandered away from him for a few minutes. Also, during a visit in January 2020, D.R. fell asleep twice—once for five minutes and once for eight minutes. Due to these observations during visits, the Department was concerned about D.R.'s ability to safely parent M.R.

Corbin Salas, a department social worker assigned to the case, suspected D.R. might be using controlled substances. Salas noted that before he was assigned the case, D.R. had fallen asleep during visits and the court had entered an order requiring him to "stay awake in visits for a 30-day period in order to get his visits in the community." 2 VRP (Sept. 30, 2020) at 289-90; *see* 3 VRP (Oct. 5, 2020) at 473-74. Salas asked D.R. to provide a UA sample to test for controlled substances. On January 30, 2020, D.R. went to KRC for a UA test but left without providing a UA sample. The KRC staff member who monitored D.R.'s visit submitted an incident report documenting D.R.'s attempt to provide a UA sample ("incident report"). The incident report contained the following statements:

> [D.R.] was seen unable to pee, *struggling* [*with*] *a UA device* he was attempting to open up. When staff asked if he would produce a legitimate sample, he denied using the device [and] asked for employee's supervisor's info[rmation] because [the employee] was 'trying to look at [D.R.'s] penis.' Ultimately, [D.R.] was asked to leave [without] providing a sample.

Ex. 60, at 667 (emphasis added). KRC sent the incident report to Salas the day after D.R.'s visit. Salas was unable to reach D.R. by phone that day, so he left D.R. a voice mail and sent a text message telling him to submit a UA sample immediately.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In the Matter of the Welfare of M.R.*, No. 100144-4

D.R. did not respond or provide a sample. On March 17, 2020, at a meeting, Salas again asked D.R. to submit a UA sample, but D.R. did not comply.

After January 30, 2020, D.R. maintained sporadic contact with the Department and stopped visiting M.R. Coincidentally, this was also a time of societal disruption when, in January, the first confirmed 2019 Novel Coronavirus (COVID-19) case was reported in Washington State.[4] Shortly thereafter in March 2020, the Department restricted parent-child visits to virtual meetings to help prevent the spread of COVID-19 and offered D.R. visits with M.R. via videoconference. The Department gave D.R. a phone and told him he could also use department equipment for virtual visits. D.R. said he had trouble figuring out how to use the videoconferencing platform. He did not see M.R. again for five months but resumed regular visits with her in July 2020, first via videoconference and then in person beginning in August 2020.

In May 2020, the Department filed a motion to modify D.R.'s services and visitation schedule and to make findings at a permanency plan hearing. Even though D.R. had remedied his housing and employment issues by that time,[5] the Department cited concerns about D.R.'s parenting abilities, his prior reluctance to cooperate with

---

[4] *See* Press Release, U.S. Ctrs. for Disease Control & Prevention (Jan. 21, 2020), First Travel-related Case of 2019 Novel Coronavirus Detected in United States, https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html [https://perma.cc/M2BP-9ELF].

[5] D.R. obtained stable housing around April 2020. He also had maintained his employment as a landscaper until he was in a car accident in August 2020.

*In the Matter of the Welfare of M.R.*, No. 100144-4

a social worker who had attempted to help him obtain stable housing, D.R.'s perceived communication difficulties and inability to cope with interpersonal conflict, D.R.'s observed use of a UA device during the January 30, 2020 incident, and D.R.'s lack of contact with the Department and M.R. after the January 30, 2020 incident. The judge ordered D.R. to complete additional protective parenting counseling and to obtain an updated drug and alcohol assessment, and a psychological evaluation. At the time of the termination trial, D.R. had not completed these services, but on October 6, 2020, the second-to-last day of trial, he had scheduled meetings with psychological evaluation and drug and alcohol assessment providers.[6]

### C. Termination of D.R.'s parental rights

The termination trial was held via videoconference in September and October 2020. The KRC staff member who wrote the incident report was not called as a witness,[7] and the Department sought to introduce the incident report through the testimony of Keith Winfield, the director of KRC. Winfield established that all UAs at KRC were monitored so staff could ensure the UA samples "[are] not being

---

[6] D.R. testified that he had not yet been able to complete the assessments because of the COVID-19 pandemic and his issues with chest pains that began in April.

[7] From the record, it appears the Department made no attempt to locate the KRC staff member. The KRC director testified the staff member had voluntarily left his position, and, though he did not know his exact location, the director believed the staff member was in New Mexico taking care of his grandparents. 1 VRP (Sept. 28, 2020) at 51 ("I do not [have a forwarding address for him]. HR may, but as far as we know, no.").

8

*In the Matter of the Welfare of M.R.*, No. 100144-4

doctored in any way." 1 VRP (Sept. 28, 2020) at 47. He testified that KRC staff do not receive "specific training" on UA test observation, but they "generally have been trained about how to observe a UA" by "listening for different sounds or watching" the person providing the sample by using mirrors directly behind and to the side of the toilet. *Id*. at 48-49, 57-58. KRC staff are required to write a report within 24 hours if there is an incident during a UA test. Winfield testified that incident reports are kept in the normal course of business for a few key purposes: (1) to keep a record of the event in KRC's files, (2) to be used in KRC "quality management meetings" to determine whether staff are following KRC procedures and whether those procedures could be improved, and (3) to determine whether KRC should contact the Department. *Id*. at 49-50.

Winfield testified that he reviewed all incident reports in the regular course of his duties and that he had discussed the incident report from January 30, 2020 with the former KRC staff member "[t]he following morning." *Id*. at 49, 51. Regarding the meaning of the "UA device" noted in the incident report, Winfield testified that the phrase "using a device" typically meant the person providing the UA sample was using a prosthetic penis, "called a Whizzinator," to "fool the monitor" and provide an illegitimate UA sample. *Id*. at 55. He conceded he did not know what specific device was observed during D.R.'s visit and stated it was not KRC policy to photograph or confiscate UA devices.

9

*In the Matter of the Welfare of M.R.*, No. 100144-4

The Department requested that the incident report be admitted as a business record for the "specific observation of the device." *Id*. at 52-53. D.R. objected on the grounds that the record "certainly [was] not objective" and that Winfield was improperly going "to testify as to the present impressions and the understanding of a third party who [was] not being presented as a witness." *Id*. The judge admitted the record without any limitation, finding it satisfied all criteria under RCW 5.45.020.[8] At trial, D.R. denied using a UA device; he testified that he showed the KRC staff member his genitalia to prove he had no device and explained he was having trouble urinating because he had recently defecated. D.R. testified that he asked the KRC staff member if he could drink water and try again a little later, but the staff member refused and asked him to leave.

In addition to the incident report, the Department presented testimony from Salas, the GAL previously assigned to M.R.'s case, and accompanying Department records of D.R.'s visits. Salas testified it was a "huge concern" that D.R. was seen with a UA device and was asked to leave KRC. 2 VRP (Sept. 30, 2020) at 315-16. Because of the January 30, 2020 incident and D.R.'s continued refusal to provide a UA sample, Salas believed D.R. was "hiding some substance use that could have

---

[8] The incident report was also admitted without objection as an attachment to a separate exhibit (Exhibit 55) at trial. Although the Department argued at the Court of Appeals that the incident report was substantively admitted through Exhibit 55, it has abandoned that claim here. Resp't's Suppl. Br. at 10 n.3. Therefore, we do not reach D.R.'s claims of judicial estoppel and ineffective assistance of counsel related to this argument.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

been going on for a couple of years." *Id*. at 319 (stating approximately two years had passed since D.R.'s last UA test). Salas also testified the Department treats a missed UA as a positive test for controlled substances.

Salas said the Department would not have pursued termination if the issues during D.R.'s visits (the bicycle incident, falling asleep, not noticing M.R. wandering off) were the only noted behavior problems. However, Salas testified the Department was prompted to move forward with its petition because of D.R.'s months-long failure to provide a UA sample and his attempted use of a UA device, coupled with the incidents during visits, the fact that D.R. did not visit M.R. from February 2020 to July 2020, D.R.'s cognitive issues impeding his ability to communicate and cope with interpersonal strife, D.R.'s "poor communication" with the Department despite a court order requiring him to maintain contact, and D.R.'s lack of progress in completing the additional court-ordered services. *Id*. at 335, 354-56, 371. Salas testified that D.R. appeared not to "understand what needed to be corrected" with respect to his parenting and that D.R.'s behavior showed he was unlikely to correct his parenting deficiencies in the near future (three months). *Id*. at 370-78.

The GAL assigned to the case from 2016 to 2019 also testified about D.R.'s perceived parenting deficiencies, criminal history, and inability to provide a safe home for M.R. She added M.R. was currently in a "stable and loving" home that met

*In the Matter of the Welfare of M.R.*, No. 100144-4

all her needs, and, in the GAL's opinion, it was in M.R.'s best interests to terminate D.R.'s parental rights so she could be adopted by her current foster home. 1 VRP (Sept. 28, 2020) at 145-46.

D.R. testified he did not recall Salas asking him to submit a UA sample on January 31, 2020, and implied he did not receive the text message request from Salas.[9] He explained he did not go to KRC in March 2020 because he was generally worried about contracting COVID-19.[10]

The judge found that (1) D.R. had failed to "complete or even engage in any of his [court-ordered] services ordered on May 22, 2020 until the termination trial had already started," despite the fact that the services were available to him, (2) D.R. had refused to accept the Department's assistance to access the court-ordered services, (3) D.R. had failed to complete the required drug and alcohol assessment or protective parenting counseling, (4) D.R. had demonstrated inattentiveness and other unsafe behavior during his visits with M.R., (5) D.R. showed cognitive issues

---

[9] D.R. testified at trial that the screen on his phone was cracked, which made it difficult to see text on the screen and type messages. However, he acknowledged that he communicated with Salas via text message in January and February 2020.

[10] On appeal, D.R. attributes his reluctance to return to KRC to provide a UA sample to his concern that he was at elevated risk of serious illness were he to contract COVID-19. *See* Suppl. Br. of Pet'r at 14. However, the health conditions he cited as creating this elevated risk, chest pains and injury from a car accident, did not occur until April and August 2020, respectively, which were, at minimum, two weeks after Salas's follow-up request for a UA sample at the in-person meeting on March 17, 2020. *See* Ex. 61, at 670; 3 VRP (Oct. 5, 2020) at 517-18, 521, 563-65, 569. D.R. did, however, testify at one point that "the heart problem" began in February. 3 VRP (Oct. 5, 2020) at 572.

*In the Matter of the Welfare of M.R.*, No. 100144-4

and a lack of parenting skills, and (6) D.R. was caught with a device on January 30th and "refused to provide any follow up UA's [sic]." Clerk's Papers at 153-54 (concluding D.R. had not demonstrated a desire or ability to parent M.R. full time throughout her dependency and had not taken her needs seriously or prioritized her needs). Based on these findings, the judge determined the Department had met its burden of proving D.R.'s parental unfitness and that termination would be in M.R.'s best interests, and he terminated D.R.'s parental rights.

D.R. appealed, arguing the incident report was improperly admitted as a business record "because the [KRC] staff member used their 'skill of observation and judgment'" while monitoring the January 30, 2020 UA test. Ruling Affirming Ord. Terminating Parental Rts., *In re Welfare of M.R.*, No. 55538-7-II, at 11 (Wash. Ct. App. July 13, 2021) (quoting Mot. for Accelerated Rev. at 36). D.R. contended the admission of the incident report was prejudicial because the Department relied on it heavily at trial and the judge improperly used it to evaluate D.R.'s credibility and parental fitness. The Court of Appeals commissioner affirmed, *id*. at 23, and a Court of Appeals panel of judges declined to modify the commissioner's ruling. Ord. Den. Mot. to Modify Comm'r's Ruling, *In re Welfare of M.R.*, No. 55538-7-II (Wash. Ct. App. Aug. 10, 2021). This court has granted D.R.'s petition for review, which seeks reversal of the trial court order terminating his parental rights. The sole

13

*In the Matter of the Welfare of M.R.*, No. 100144-4

issue before this court is the admissibility of the incident report as a business record

under RCW 5.45.020.

ANALYSIS

A.      Standard of Review

This court reviews de novo a trial judge's interpretation of the rules of

evidence. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). Where a

judge has correctly interpreted an evidentiary rule, this court reviews the decision to

admit evidence under that rule for an abuse of discretion. *Id.*; *State v. Ziegler*, 114

Wn.2d 533, 538, 789 P.2d 79 (1990) ("The trial judge's decision to admit or exclude

business records is given great weight and will not be reversed unless there has been

a manifest abuse of discretion."). An abuse of discretion occurs if a judge's decision

was "manifestly unreasonable," meaning no reasonable person would reach the same

conclusion, or if it "rests on untenable grounds," meaning it relied on facts not

supported by the record or on an incorrect legal standard. *State v. Griffin*, 173 Wn.2d

467, 473, 268 P.3d 924 (2012).

If an abuse of discretion was committed, this court then reviews the error for

prejudice to determine whether "'within reasonable probabilities, the outcome of the

trial would have been materially affected had the error not occurred.'" *State v.*

*Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997) (error is harmless if

improperly admitted evidence "is of minor significance in reference to the overall,

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In the Matter of the Welfare of M.R.*, No. 100144-4

overwhelming evidence as a whole") (quoting *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

> B.　　Admissibility of the incident report under the business records exception to the rule against hearsay
>
>> 1.　<u>Purpose of the business records exception and underlying assumptions</u>

Otherwise inadmissible hearsay evidence may be admitted if it falls under one of several exceptions. ER 801(c), 802. The business records exception in the case before us provides:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

RCW 5.45.020. To qualify under this exception, a record must satisfy five elements, "each designed to insure the reliability of the evidence." *State v. Kreck*, 86 Wn.2d 112, 118, 542 P.2d 782 (1975); *see Cantrill v. Am. Mail Line, Ltd.*, 42 Wn.2d 590, 607-08, 257 P.2d 179 (1953) (exception created "for the purpose (among others) of making evidence that would otherwise be hearsay competent evidence" because record bears sufficient indicia of reliability). First, it "must be in the form of a 'record.'" *Kreck*, 86 Wn.2d at 118 (relatively permanent preservation of record suggests it "will have those characteristics relied upon to establish accuracy" (quoting MᴄCᴏʀᴍɪᴄᴋ's Hᴀɴᴅʙᴏᴏᴋ ᴏꜰ ᴛʜᴇ Lᴀᴡ ᴏꜰ Eᴠɪᴅᴇɴᴄᴇ § 307, at 720

15

*In the Matter of the Welfare of M.R.*, No. 100144-4

(Edward Cleary ed., 2d ed. 1972)) (quoting RCW 5.45.020). Second, it "must be of an 'act, condition or event,'" as opposed to a recorded opinion or statement of cause. *Id*. (quoting RCW 5.45.020). Third, it "must be made in the regular course of business." *Id*. ("Important to meeting this requirement is the absence of 'a motive and opportunity to falsify the record'" (quoting MCCORMICK'S, *supra*, § 308, at 724)). Fourth, it must be made "'at or near the time of the act, condition or event.'" *Id*. (relatively contemporaneous creation of record alleviates concerns of "possibility of inaccuracy by lapse of memory or otherwise") (quoting RCW 5.45.020). Fifth, "[t]he court must be satisfied that 'the sources of information, method and time of preparation were such as to justify its admission.'" *Id*. (noting MCCORMICK'S, *supra*, at § 310 "suggests this requirement can usually be met when the record has been made upon the personal knowledge of the recorder") (quoting RCW 5.45.020).

The business records exception also is recognized as an efficient mechanism to save courts the time, expense, and inconvenience (or impossibility) of calling multiple witnesses who may have contributed to the creation of such records. *Young v. Liddington*, 50 Wn.2d 78, 83, 309 P.2d 761 (1957); *see Cantrill*, 42 Wn.2d at 608 (noting importance of exception in context of hospital records typically created by multiple "attendants, nurses, physicians, X ray technicians, laboratory and other hospital employees").

*In the Matter of the Welfare of M.R.*, No. 100144-4

"[B]usiness records are presumptively reliable if made in the regular course of business and there was no apparent motive to falsify." *Ziegler*, 114 Wn.2d at 538. Fundamentally, this presumption "is based upon the belief that a business has a strong incentive to keep accurate records of its own transactions and activities." 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE § 803:20, at 450 (2020). Several additional subsidiary assumptions underlying this default reliability merit a brief discussion.

First, "[i]mplicit in [this assumed reliability] is the presumption that an employee will do his duty." *State v. Rutherford*, 66 Wn.2d 851, 853, 405 P.2d 719 (1965). For example, in the context of medical diagnosis and treatment, the Court of Appeals has deemed medical tests "particularly trustworthy because the hospital relies on its staff members to competently perform their duties when making often crucial life and death decisions." *Tennant v. Roys*, 44 Wn. App. 305, 312, 722 P.2d 848 (1986); *see also State v. Mason*, 31 Wn. App. 680, 684, 644 P.2d 710 (1982) (record with double hearsay inadmissible because "[t]here is no way to verify . . . the reliability of the . . . []complainants who related the information written on the . . . forms, and who are of course not employees of the health department" and therefore had no duty to supply accurate information).

Second, the person who prepares a particular business record may be "unlikely to recall the details of the transaction or event in question" because of the

17

*In the Matter of the Welfare of M.R.*, No. 100144-4

routine nature of the record and the frequency with which such records are produced. *Kreck*, 86 Wn.2d at 120; *see In re Det. of Coe*, 175 Wn.2d 482, 505, 286 P.3d 29 (2012) ("The business record exception generally applies to objective records of a regularly recorded activity and not those 'reflecting the exercise of skill, judgment, and discretion.'" (quoting 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803:37 (5th ed. 2007)). Cross-examination of the report preparer, therefore, would be of little value. *Kreck*, 86 Wn.2d at 120. For example, a chemist who conducts thousands of blood tests annually would be unlikely to remember "the details of a routine test made over 2 years before, when he has likely made over 1,000 similar tests in the meantime." *Id*.

Third, such records are created for clerical purposes and not in anticipation of litigation. *State v. Jasper*, 174 Wn.2d 96, 112, 271 P.3d 876 (2012) (facially valid business records may not be admitted "'if the regularly conducted business activity is the production of evidence for use at trial'" (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)). For example, affidavits from the Department of Licensing regarding defendants' driving privileges were deemed inadmissible because the records were created specifically for use as evidence at trial and were therefore testimonial in nature. *Id*. at 115-16 (also holding it was error to admit certification from Department of Labor and Industries regarding nonexistence of party's contractor license for same reason).

*In the Matter of the Welfare of M.R.*, No. 100144-4

However, a business record created for proper internal business purposes may still be admissible even if it may ultimately be presented as evidence at trial, provided the court is satisfied all other admissibility requirements have been met. *Compare id.* (documents inadmissible because they were created for trial), *with State v. Bellerouche*, 129 Wn. App. 912, 916-17, 120 P.3d 971 (2005) (police trespass notice admissible as business record because it was not prepared for trial and thus "not the functional equivalent of testimony"), *and State v. Quincy*, 122 Wn. App. 395, 401, 95 P.3d 353 (2004) (shoplifting arrest record and list of stolen merchandise admissible because it was "created in the regular course of business" and in case matter ever went to court).

Central to our analysis in this case is the principle that the business records exception "was not adopted to permit evidence of the recorder's opinion, upon which other persons qualified to make the same record might have differed. Nor was it intended to admit into evidence conclusions based upon speculation or conjecture." *Young*, 50 Wn.2d at 83; *see id.* at 83-84 (doctor's diagnosis of epilepsy admissible but not doctor's opinion or conclusion regarding cause, which "could only be based upon speculation or conjecture"). Thus, routine records created in the normal course of business may be inadmissible if they contain conclusions or opinions based on the preparer's special degree of skill or discretion. *Id.* at 83-84; *see Liljeblom v. Dep't of Lab. & Indus.*, 57 Wn.2d 136, 141, 356 P.2d 307 (1960) ("Business records are

19

not admissible for the purpose of proving the conclusions there recorded."); *In re Welfare of J.M.*, 130 Wn. App. 912, 923-24, 125 P.3d 245 (2005) (psychological expert opinion could not be admitted as business record introduced through nonexpert testimony). Such records are not accorded the same presumption of reliability because they rest on subjective analyses that should be subject to cross-examination to test the accuracy of the preparer's conclusions. *Cf. Young*, 50 Wn.2d at 83 (business "records are permitted in evidence to prove the truth and accuracy of accounts then present and contemporaneously recorded").

For example, in *State v. Wicker*, 66 Wn. App. 409, 411-12, 832 P.2d 127 (1992), the Court of Appeals deemed inadmissible a fingerprint test report that bore the initials of a nontestifying fingerprint expert. The court explained the presence of the initials on the report, by themselves, would have been admissible as a business record; however, presented alongside the testimony of a different fingerprint technician who said the initials verified the test results, the initials essentially were presented as an opinion from a nontestifying expert that she had examined the prints and found they matched. *Id*. at 412. In contrast, however, an assistant medical examiner's observations recorded in an autopsy report were deemed admissible to the extent they constituted "objective facts" and not expert opinion. *State v. Heggins*, 55 Wn. App. 591, 594, 779 P.2d 285 (1989) (admitting "findings that the bullet had

*In the Matter of the Welfare of M.R.*, No. 100144-4

traveled at an angle . . . and had passed through a number of vital organs, causing [the victim's] death").

In *Welfare of J.M.*, 130 Wn. App. at 924, the Court of Appeals deemed inadmissible several expert psychological reports that were introduced through the testimony of a nonexpert social worker. Among various conclusions, the social worker "testified that [the mother] exhibited an unspecified personality disorder with histrionic and narcissistic features and also 'child neglect, failing to protect'" based on one such psychological evaluation. *Id*. at 916-17. The court determined the reports "were hardly routine clerical notations of the occurrence of objective facts. The evidence documented in these records involved a high degree of skill of observation, analysis, and professional judgment," and, thus, cross-examination of the experts would have been valuable. *Id*. at 924.

Similarly, this court and the Court of Appeals have held that police reports generally are inadmissible because they are subjective summaries of the results of a criminal investigation and defendants should have the opportunity to challenge investigating officers' conclusions based on their use of skill, judgment, or discretion. *Det. of Coe*, 175 Wn.2d at 502, 505 (deeming inadmissible report from computer system that aggregated details from police reports, including person's demographic information, relationship with victim, weapon and force used); *State v. Hines*, 87 Wn. App. 98, 101-02, 941 P.2d 9 (1997) (deeming inadmissible police

21

*In the Matter of the Welfare of M.R.*, No. 100144-4

summary of traffic stop containing officer's observations, including that driver and children were not wearing seatbelts, and "statements which tend to cast [the defendant] in an unfavorable light, i.e., she gave an alias when first approached by the patrolman").

## 2.   Admissibility of the incident report

Washington courts have traditionally accepted as business records clerical records and empirically verifiable scientific tests. *See, e.g.*, *Ziegler*, 114 Wn.2d at 539-40 (lab report showing chlamydia test results kept in patient's hospital record); *Kreck*, 86 Wn.2d at 119-20 (blood test result showing presence of chloroform); *Rutherford*, 66 Wn.2d at 855 (results of materials test on unknown metal); *Cantrill*, 42 Wn.2d at 608 (hospital records); *State v. Doerflinger*, 170 Wn. App. 650, 663-64, 285 P.3d 217 (2012) (CT (computed tomography) scan showing nose fracture kept as part of patient's medical record); *Quincy*, 122 Wn. App. at 401 (shoplifting arrest record and list of stolen merchandise); *Hines*, 87 Wn. App. at 101 (jail manager's booking sheet with defendant's phone number, address, height, and weight); *State v. Rainwater*, 75 Wn. App. 256, 259-60, 876 P.2d 979 (1994) (evidence label itemizing stolen goods recovered by security guard); *State v. Sellers*, 39 Wn. App. 799, 806-07, 695 P.2d 1014 (1985) (lab report with defendant's blood type kept in doctor's patient file). However, the business records exception has not been expressly limited in its application to laboratory tests, computer-generated

*In the Matter of the Welfare of M.R.*, No. 100144-4

reports, or other purely bookkeeping records. *See Young*, 50 Wn.2d at 83 (providing examples of business records, such as "payrolls, accounts receivable, accounts payable, bills of lading, and so forth"); *see also, e.g.*, *Bellerouche*, 129 Wn. App. at 916-17 (trespass notice); *Quincy*, 122 Wn. App. at 401 (shoplifting arrest record); *Heggins*, 55 Wn. App. at 596 (portions of autopsy report); *State v. Medley*, 11 Wn. App. 491, 498-99, 524 P.2d 466 (1974) (fingerprint record with photograph). In fact, provided the document in question is a record of an act, condition, or event made in the normal course of business and prepared contemporaneously or soon after the act, condition, or event, the business records exception grants trial judges considerable discretion to admit records "if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." RCW 5.45.020.

On its face, the incident report appears to satisfy the requirements of the business records exception set forth in *Kreck*: (1) it was a record, a report written on a KRC incident report form, (2) of an event, D.R.'s visit to KRC on January 30, 2020 where a staff member observed a UA device and D.R. failed to provide a UA sample, (3) the custodian of all KRC incident reports, Winfield, testified that such records are kept in the regular course of KRC's business, (4) it was created shortly after the event, within 24 hours of the failed UA test, and (5) the report was based on the KRC staff member's personal knowledge, and there was no evidence that the KRC staff

23

*In the Matter of the Welfare of M.R.*, No. 100144-4

member had any motive to falsify the incident report or that other factors called into doubt the source, method, or time of its preparation. *See Kreck*, 86 Wn.2d at 118-19. D.R. argues that the incident report was inadmissible under prong (2) because it was not a record of an act, condition, or event but, instead, consisted of subjective opinion and conclusions that should have been subject to cross-examination. Suppl. Br. of Pet'r at 1, 19. *See Kreck*, 86 Wn.2d at 118. Although personal observations are subjective to a degree, that does not disqualify the incident report from admission under the business records exception; pure, mechanical objectivity is not a prerequisite under RCW 5.45.020. The trial judge recited the correct legal standard for the exception, and the record reveals he considered the appropriate criteria to determine whether the incident report qualified as a business record. 1 VRP (Sept. 28, 2020) at 51-54 (finding "all [five] of th[e] conditions precedent [of RCW 5.45.020] to be met").

Further, several key factors weigh heavily in favor of admissibility of the incident report. First, the incident report does not contain statements of opinion or conclusion from the KRC staff member. *Cf. Welfare of J.M.*, 130 Wn. App. at 924. It states clearly that D.R. was seen unable to urinate,[11] the staff member saw him attempting to open a UA device, the staff member asked D.R. "if he would produce a legitimate sample," D.R. denied having a UA device and accused the staff member

---

[11] D.R. himself testified that he was unable to urinate.

24

*In the Matter of the Welfare of M.R.*, No. 100144-4

of trying to look at his penis, and the staff member asked D.R. to leave without providing a sample. Ex. 60, at 667. Certainly, an important inference could be drawn from this, namely, that D.R. was attempting to use a UA device to provide a sample that did not belong to him. However, the staff member merely relayed the sequence of events as he perceived them to have occurred; he did not conclude D.R. actually used a UA device to provide an illegitimate sample nor did he present any conclusions about the reason D.R. failed to provide a UA sample.

Second, the KRC staff member's observations did not rely on the type of skilled observation or analysis—generally acquired by experts with specialized education and training—that this court has deemed inadmissible. *Welfare of J.M.*, 130 Wn. App. at 924; *see Wicker*, 66 Wn. App. at 413 (business record cannot be used to prove conclusion on which "[n]ot all experts would necessarily agree"). Here the KRC staff member simply looked and listened while D.R. attempted to provide a UA sample. Because observing UA tests was a normal part of his work, it can be inferred that the KRC staff member had some experience in detecting UA devices; however, he had no special training that made him more qualified than the average person to observe a UA test. This case, therefore, is distinguishable from cases, such as *Welfare of J.M.* and *Wicker*, where expert opinion was excluded from the business records exception. This court held that personal observations may be admissible under the business records exception when supported by other indicia of reliability.

25

*In the Matter of the Welfare of M.R.*, No. 100144-4

*See Kim v. Lakeside Adult Fam. Home*, 185 Wn.2d 532, 550 & n.11, 374 P.3d 121 (2016) (department notes from phone call where caller stated patient "'had passed out'" might be admissible as business record because notes had "the [department] custodian's verification"); *Heggins*, 55 Wn. App. at 594, 596 & n.1 (assistant medical examiner's autopsy findings that were "objective facts" regarding cause of death were admissible as business record). Further, despite D.R.'s repeated contention that the incident report stated he was seen with "a device," *see, e.g.*, Suppl. Br. of Pet'r at 1, 7, 13, 15, 25, 27, the incident report actually states he was seen with "a UA device." Ex. 60, at 667. The phrase "a UA device" refers, unmistakably, to the kind of prosthetic tool Winfield described that people sometimes used to provide illegitimate UA samples and "fool the [KRC] monitor." 1 VRP (Sept. 28, 2020) at 55.

Third, although the record does not definitively establish how many UA tests KRC staff observed or how many incident reports were produced on a daily basis, a fair inference exists that cross-examination might have been of little use because preparing incident reports was a normal part of the KRC staff member's duties. *Kreck*, 86 Wn.2d at 120.

Fourth, Winfield established the incident report was created as a routine aspect of internal quality control at KRC, which distinguishes it from police investigation reports, affidavits, and other certifications prepared specifically with the intent or

26

*In the Matter of the Welfare of M.R.*, No. 100144-4

understanding they will be used as evidence in a criminal trial. *Cf. Jasper*, 174 Wn.2d at 112; *Hines*, 87 Wn. App. at 101-02; *Det. of Coe*, 175 Wn.2d at 505. It is immaterial that Winfield ultimately reported the incident to the Department and that the incident report was offered in evidence at D.R.'s termination trial. *See Bellerouche*, 129 Wn. App. at 916-17 ("Many business records have the same ultimate possible use, but this does not destroy their status as business records."); *Quincy*, 122 Wn. App. at 401 ("It is axiomatic that shoplifting arrest records are likely to be used in litigation. This fact alone does not mean they cannot fall within the business records exception as a matter of law.").[12]

Our review of this matter is restricted to an abuse of discretion standard to determine whether the judge erred in admitting the incident report under the business records exception pursuant to RCW 5.45.020. *Foxhoven*, 161 Wn.2d at 174. The observation of "a UA device" during the middle of a UA test, Ex. 60, at 667, is not an opinion or conclusion that relied on any special degree of expertise, such as an expert in psychology diagnosing a personality disorder, *Welfare of J.M.*, 130 Wn. App. at 916-17, or a fingerprint expert verifying the accuracy of another expert's test

---

[12] Similarly in the context of medical treatment specifically, this court and the Court of Appeals have noted that a business's reliance on the record in question weighs in favor of admissibility. *See Ziegler*, 114 Wn.2d at 539-40 (citing physician's reliance on blood test results); *Doerflinger*, 170 Wn. App. at 663-64 (citing physician's reliance on radiology reports); *State v. Garrett*, 76 Wn. App. 719, 722-23, 887 P.2d 488 (1995) (citing physician's reliance on emergency room medical reports); *see also* 5D TEGLAND, *supra*, at 450 (business records exception rests on "belief that a business has a strong incentive to keep accurate records of its own transactions and activities").

27

*In the Matter of the Welfare of M.R.*, No. 100144-4

results. *Wicker*, 66 Wn. App. at 412. Nor did it rely on speculation or conjecture, such as a physician's opinion as to the cause of epilepsy based only on secondhand information. *Young*, 50 Wn.2d at 83-84. Similar to the "objective facts" noted in the autopsy report in *Heggins*, 55 Wn. App. at 596, the incident report relied on firsthand observations from a KRC employee who observed the UA test in the regular course of his professional duties and documented his observations as required by KRC's procedures. In light of the other indicia of reliability concerning the incident report's source of information, method, and time of preparation, the judge's decision to admit it as a business record was not "manifestly unreasonable or rests on untenable grounds." *Griffin*, 173 Wn.2d at 473. There was no error, and we affirm.[13]

CONCLUSION

The January 30, 2020 incident report is a written record of D.R.'s visit to KRC and his failure to provide a UA sample. It was created in the normal course of KRC's business for internal business purposes (and not as evidence to be used at trial) and it was created within 24 hours of the incident. In addition, it was based on personal observations that did not consist of opinion or conclusions relying on specialized skill, judgment, or discretion. It was introduced through a records custodian, and no evidence was produced that otherwise called into question its reliability.

---

[13] Because the judge did not err in admitting the incident report, we do not reach D.R.'s prejudicial error argument.

28

*In the Matter of the Welfare of M.R.*, No. 100144-4

The judge did not commit an abuse of discretion in admitting the incident report as a business record under RCW 5.45.020. Therefore, we affirm.

*In the Matter of the Welfare of M.R.*, No. 100144-4

_____
Whitener, J.

WE CONCUR.

_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____

_____
Madsen, J.

_____
Yu, J.

_____
Owens, J.

_____

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 100144-4


MONTOYA-LEWIS, J. (dissenting)—I disagree with the majority's

conclusion that the incident report was properly admitted; I would hold that the

dependency court abused its discretion admitting the incident report and that the

admission was not harmless. The incident report contains observations that are

subjective in nature and susceptible to substantial error. This type of record is

beyond the scope of the types of records our courts have historically deemed

admissible under RCW 5.45.020, such as clerical or bookkeeping records, or the

types of records that document objective, reproducible scientific tests. The

majority's application of the business records exception in this case unnecessarily

expands the scope of a limited exception to a general rule. I would reverse the Court

of Appeals and conclude that the trial court abused its discretion when it admitted

the incident report and, in doing so, prejudiced the father by undermining his

credibility, ultimately leading to the termination of his parental rights.

The rules of evidence generally exclude "hearsay"—out-of-court statements

"offered in evidence to prove the truth of the matter asserted"—unless an exception

applies. ER 801(c), 802. One such exception to the rule allows for the admission of

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

hearsay when it is a business record. RCW 5.45.020. I agree with the majority that the business records exception requires that the document (1) is in record form, (2) documents an act, condition, or event, (3) is made in the regular course of business, and (4) is made at or near the time of the act, condition, or event, and (5) the sources of information, method, and time of preparation were such as to justify its admission in the opinion of the court. *Id.*; *State v. Ziegler*, 114 Wn.2d 533, 538, 789 P.2d 79 (1990) (citing *State v. Kreck*, 86 Wn.2d 112, 118-19, 542 P.2d 782 (1975)).

Where I disagree is the majority's view of the second requirement—whether this incident report can be considered a record that objectively documents an "act, condition or event." RCW 5.45.020; *Ziegler*, 114 Wn.2d at 538. While those terms are not particularly illustrative on their own, our case law provides insight. Our case law reflects the admission of business records only when they document objective, verifiable facts that are not susceptible to multiple interpretations or when they do not rely on subjective opinions that require specialized knowledge. As such, the exception has generally applied only to *objective, factual documentation* of regularly recorded activities, but not those "'*reflecting the exercise of skill, judgment, and discretion.*'" *In re Det. of Coe*, 175 Wn.2d 482, 505, 286 P.3d 29 (2012) (emphasis added) (quoting 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803:37 (5th ed. 2007)). Records that included entries in the form of *opinions* or *statements about causation* have been deemed outside the scope of

*In re Welfare of M.R.*, No. 100144-4
(Montoya-Lewis, J., dissenting)

what qualifies as a business record. *Kreck*, 86 Wn.2d at 118 (citing *Young v. Liddington*, 50 Wn.2d 78, 85, 309 P.2d 761 (1957)). Likewise, conclusions based on "*speculation or conjecture*" also do not fall within the business records exception. *Young*, 50 Wn.2d at 83 (emphasis added). The underlying basis for the exclusion of such records is that they are akin to expert opinions that require specialized education and training, and observers would not necessarily agree on the conclusions. In contrast, "cross-examination would add nothing to the reliability of clerical entries: no skill or observation or judgment is involved in their compilation." *In re Welfare of J.M.*, 130 Wn. App. 912, 924, 125 P.3d 245 (2005) (citing *N.Y. Life Ins. Co. v. Taylor*, 79 U.S. App. D.C. 66, 147 F.2d 297, 301 (1945)).

Our numerous cases exploring the scope of the business records exception illustrate a consistent pattern of distinguishing between objective factual observations as opposed to those involving subjective opinions. "[R]ecords [such as] payrolls, accounts receivable, accounts payable, bills of lading, and so forth" exemplify documentation of objective fact. *Young*, 50 Wn.2d at 83. Such records do not contain within them subjective observations or conjecture but, rather, verifiable data that is kept as part of the regular business operations. Over time, this has come to include the results of scientific tests in the context of medical records and other similar records that document the results of objective science. *E.g.*, *Kreck*, 86 Wn.2d at 119.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Welfare of M.R.*, No. 100144-4
(Montoya-Lewis, J., dissenting)

The facts in this case do not support a business record exception. The Kitsap Recovery Center (KRC) employee Jeremy Harrison wrote his observations down on the report but did not testify, and he was the only one on staff who saw the incident. The father, D.R., in this case stated adamantly and repeatedly that he did not use any sort of device to substitute his urine during the test. Harrison did not state that he actually saw the device but, instead, that he suspected the father of using one, apparently because the father struggled to urinate while being observed. The director of the facility, Keith Winfield, acknowledged in his testimony at trial that employees who do observe urinalysis (UA) receive no specific training to recognize devices that might be used to substitute urine. While Winfield himself could testify to those devices, there was no testimony that Harrison would necessarily recognize such a device, and his notes did not indicate he did. Rather, he suspected a device. That is conjecture, not objective observation, and it should not qualify as a business record.

This incident report did not contain objective observations that relied on well-established scientific methods that result in verifiable, reproducible tests. A report that documented simply that D.R. had checked into the facility to submit a sample for UA, or a laboratory test result revealing the presence or absence of a chemical substance would be more akin to the types of business records that have historically been admitted. A record of his failure to produce a specimen would also fall under

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

this category. The problem here is that the record went further, and then Winfield too went further, by speculating on the type of devices Harrison might have seen, but did not document or confiscate from D.R.

In my view, the incident report does not qualify as a business record because it goes beyond objectively describing an "act, condition or event." RCW 5.45.020. Given the full context of how KRC staff observe individuals providing UA samples, an observer could have varying interpretations of what had occurred while D.R. attempted to provide a UA sample. KRC staff accompany the person into the bathroom, listen to specific sounds, and indirectly watch what the person is doing from behind and with a mirror. KRC does not appear to require their staff to ask the person to show their private parts or physically inspect them for a device. They also do not take photos or confiscate any devices. Conclusions drawn from simply listening and indirectly viewing are speculative and conjectural, allowing for different staff persons to come to differing conclusions based on subjective interpretations. When we consider the full context of how KRC staff observe individuals providing UA samples, the observer could not have objectively concluded that D.R. used a device.

Given the full context of how KRC staff observed D.R.'s attempted UA test, the only factual objective observation in the incident report is that the KRC staff person took D.R. into the bathroom and observed that D.R. could not produce a urine

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

sample. His *opinion* in his written report that a device must have been used because D.R. was having trouble producing a UA was just that—an opinion. Such a conclusion is a statement on causation—that the cause of D.R.'s failure to produce a UA sample is his attempt to use a device—is not permitted under the business records exception. *Kreck*, 86 Wn.2d at 118. I would hold the admission of this document was error.

I would hold further that this error was not harmless.

We reverse the lower court's evidentiary error only if it results in prejudice. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001) (citing *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). An error is considered prejudicial if, "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *Id.* (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). However, the "[i]mproper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole." *Id.* (citing *Thieu Lenh Nghiem v. State*, 73 Wn. App. 405, 413, 869 P.2d 1086 (1994)).

The incident report and the record custodian's testimony regarding the meaning of the report itself were not "of minor significance" and thus cannot be considered harmless. *Id.* D.R. had a history of following the Department of Children, Youth, and Families' (Department) requirements and the dependency

6

*In re Welfare of M.R.*, No. 100144-4
(Montoya-Lewis, J., dissenting)

court's orders. When he was ordered to, he got a substance abuse evaluation, which found no substance abuse problem, and when he was ordered to take parenting classes, he completed them successfully. Indeed, he completed all the court-ordered requirements, including obtaining employment and finding safe, stable housing. The only remaining issues that led to the Department filing for termination were relatively minor concerns during visitation, lack of engagement with the court-ordered services from May 2020, his inability to comply with UA requests, and lack of visitation during the early part of 2020.

In light of the uncertainty and ever-changing safety restrictions throughout 2020 due to the pandemic, it is not surprising that it took D.R. several months before scheduling his required services and that he decided not to visit M.R. for fear of catching and spreading the virus.

Corbin Salas, the social worker, testified that these issues alone would not have warranted moving to termination. He also identified that being "caught using a device" was a significant factor in the Department's decision to pursue termination. 2 VRP (Sept. 30, 2020) at 355-56. In his testimony, he mentioned being caught with a device eight times to describe D.R.'s deficiencies. *See, e.g., id.* at 310, 315, 331, 335, 354, 355-56. The Department also repeatedly relied on the incident in closing argument to assert that D.R.'s alleged use of a device placed the dependency on a different trajectory—toward termination—and indicated that D.R. was using illegal

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

substances, which rendered him unfit and in need of additional services. *See, e.g.*, 3 VRP (Oct. 9, 2020) at 608-12, 616, 649 (emphasizing "the father was caught using a device at KRC. I want to make a big deal. This is a huge deal and a significant turning point in the case"). The Department emphasized that using a device "shows the father's willingness to essentially lie and … manipulate the system in order … to hide potential parental deficiencies." *Id.* at 610. Similarly, the dependency court's findings in favor of termination focused on D.R.'s fitness to parent and reflected the court's low assessment of D.R.'s credibility. The dependency court found that D.R. had used a device, repeatedly referenced the significance of the date of the alleged incident, found that D.R. was not credible—despite a lack of any other examples of dishonesty—and found that he was unlikely to finish the court-ordered services, despite D.R.'s prior history of completing all services. Thus, the incident report's conclusion that D.R. used a UA device was of considerable significance.

The trial court and the majority minimize the impact and effects of the COVID-19 pandemic. The majority points out that by the termination trial, D.R. had not completed the services ordered and had only scheduled meetings with psychological evaluation and drug and alcohol assessment providers. The majority casts doubt on D.R.'s purported fears of contracting COVID-19 due to his elevated risk of serious illness were he to contract COVID-19 by pointing to the fact that his health conditions—chest pains and injury from a car accident—did not occur until

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Welfare of M.R.*, No. 100144-4
(Montoya-Lewis, J., dissenting)

April and August 2020. Majority at 12 n.10. The majority acknowledges the backdrop of the ongoing, unprecedented global pandemic but glazes over the practical realities of how many individuals in our community modified their lifestyles to protect themselves and the safety of their loved ones. The first confirmed case of COVID-19 in the United States was a patient in Washington on January 15, 2020, and the first death occurred only a few weeks later.[1] That same week, Governor Inslee declared a state of emergency in response to the growing spread of the illness.[2] For several subsequent months, all were encouraged to remain at home except for conducting absolutely essential activities in order to help prevent the spread.[3] Lack of personal protective equipment in the early stages of the

---

[1] *See* Press Release, U.S. Ctrs. for Disease Control & Prevention, First Travel-related Case of 2019 Novel Coronavirus Detected in United States, (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html [https://perma.cc/M2BP-9ELF]; Press Release, U.S. Ctrs. for Disease Control & Prevention, CDC, Washington State Report First COVID-19 Death (Feb. 29, 2020), https://www.cdc.gov/media/releases/2020/s0229-COVID-19-first-death.html[http://perma.cc/7X3Q-6LAF].

[2] Proclamation by Governor Jay Inslee, No. 20-05 (Wash. Feb. 29, 2020), https://www.governor.wa.gov/sites/default/files/20-05%20Coronavirus%20%28final%29.pdf?utm_medium=email&utm_source=govdelivery [https://perma.cc/TAF6-QNGB].

[3] Proclamation by Governor Jay Inslee, No. 20-25 ("Stay Home – Stay Healthy" order) (Wash. Mar. 23, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-25%20Coronovirus%20Stay%20Safe-Stay%20Healthy%20(tmp)%20(002).pdf [https://perma.cc/PJ48-WAEY] ("All people in Washington State shall immediately cease leaving their home or place of residence except: (1) to conduct or participate in essential activities, and/or (2) for employment in essential business services."). This order was extended through May 31, 2020. Proclamation by Governor Jay Inslee, No. 20-25.3 ("Adjusting and Extending Stay Home – Stay Healthy to May 31, 2020") (May 4, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-25.3%20-%20COVID-19%20Stay%20Home%20Stay%20Healthy%20-%20Reopening%20%28tmp%29.pdf [https://perma.cc/J6PC-DJ5Q].

9

*In re Welfare of M.R.*, No. 100144-4
(Montoya-Lewis, J., dissenting)

pandemic added to the lack of security people felt when leaving their homes. As the governor's proclamation acknowledges, "[T]his unprecedented health crisis has caused extraordinary anxiety and a significant disruption of routine and important activities for every Washingtonian."[4] The Department itself suspended in-person visitation between *mid-March and early August* to comply with our state's public safety restrictions. 2 VRP (Sept. 30, 2020) at 337-38, 359; 3 VRP (Oct. 5, 2020) at 419. The majority appears to downplay the significance of the pandemic in uprooting people's lives and the ways in which it changed people's behavior to protect themselves and their loved ones. It also ignores the generalized fears people had, regardless of the presence or severity of any underlying health conditions, around contracting the novel virus or spreading it to their loved ones.[5]

Given the significance of the conclusion that D.R. had used a device to fake a UA compared to the relatively minor concerns about visitation, his previous record of completing court-ordered services, and the constraints the early months of the COVID-19 pandemic placed on his ability to see M.R. and engage in services, it is within reasonable probability that the outcome of the termination trial would have

---

[4] Proclamation No. 20-25.3, *supra*, at 2.

[5] *See* Proclamation No. 20-25.3, *supra*, at 2 ("[T]his unprecedented health crisis has causes extraordinary anxiety and a significant disruption of routine and important activities for every Washingtonian."); 26A CHERYL C. MITCHELL & FERD H. MITCHELL, WASHINGTON PRACTICE: WASHINGTON ELDER LAW AND HEALTH LAW § 10:170 (2022); Michele Bedard-Gilligan, Emma PeConga & Lori Zoellner, *A cough, and our hearts stop: Coping with coronavirus anxiety and fear*, SEATTLE TIMES (Mar. 13, 2020), https://www.seattletimes.com/opinion/anxiety-and-fear-from-the-tip-of-the-coronavirus-spear/ [https://perma.cc/66H8-PZYL].

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Welfare of M.R.*, No. 100144-4
(Montoya-Lewis, J., dissenting)

been materially affected if this hearsay had not been erroneously admitted. *See Neal*, 144 Wn.2d at 611. The contents of the incident report changed the termination court's view of D.R. and suggested he be viewed with suspicion, despite the other efforts he put in to address any parenting issues. COVID-19 complicated the completion of his visits, but he stated his very reasonable fear that he might either communicate or contract the virus to or from M.R. The testimony that he used a device to fake a UA transformed his image from a serious, committed father trying to reunite with his child to a father who should be viewed with suspicion and contempt and, ultimately, as having an inability to parent. I would hold the admission of the incident report and Winfield's testimony about it was error and error that was harmful. Therefore, I would reverse the Court of Appeals.

I respectfully dissent.

_____
Montoya-Lewis, J.

_____
Gordon McCloud, J.

11